Good morning, Your Honors. May it please the Court, my name is Glenn Downey, and I represent appellants Karen and Richard Shook in this matter. I'd like to reserve two minutes for rebuttal time, if I could. Surely. I was unclear as to exactly when Mrs. Shook retired or made her declaration to retire. What was the date on that? It's not in the record what the exact date is. I can represent it as late 2003. It would be November of 2003, but the exact date has not been put on the record. All right, but we can rely on November 2003. November of 2003 was when that decision is made. I think I'd like to start with moving first towards whether we can determine whether the District Court erred when it concluded first that there was no misrepresentation. The District Court seemed to rely on the fact that all the correspondence prior to Karen Shook's retirement in late 2003, in the District Court's opinion, it was all consistent regarding the use of Mr. Shook's octel service credits. And I think looking at the record as a whole and looking at the timeline of correspondence received, it's clear that it wasn't, in fact, consistent. I really thought the District Court's point was that while the latest letter, the November 21 letter, may have used the 1980 date, it wasn't specific. It didn't say you can rely on this for pension purposes. And previous letters had different dates so that there was kind of your put on an inquiry notice that you should do something more rather than relying on the November 21, 2000 letter. And I think while that may go to the reasonableness of whether, in fact, he should have done further inquiry, it doesn't go to the fact of whether there was a misrepresentation or not. So you think there was an issue of fact on that? I think there was an issue of fact on that, clearly. And what points to that most glaringly is the fact that when, in fact, he got a pension calculation, the service center itself made a mistake, the exact mistake that Richard Shook made when he personally calculated his benefits. But he certainly knew that there was a problem here because there had been a grievance. He had filed a grievance. And it wasn't that he wasn't on notice. There may have been a difference of opinion or a different view on that. Well, I think what's interesting is the dates prior to the grievance and the correspondence clearly indicated that octel service would not be included. If we look, I think, specifically at the October 18, 1999 letter he received from the pension service center. And that used the 98 date. It used the 98 date and it said octel service will not be included in your NCS date. He files a grievance in April of 2000. The next series of correspondence that he gets changes his NCS date to include octel service. So I'm surprised that you're not arguing that there really is not an issue of fact that, indeed, he was entitled to rely on that November 21, 2000 letter. I absolutely think he was. What I'm saying in terms of the issue of fact. Because if you got this after the fact, after the grievance, you'd say, oh, well, then this is the result and this must be conclusive. If we change the facts to say that he received the pension calculation worksheet that is on the record that he received that uses the incorrect date, the 1980 date, and then a decision had been made to retire, I don't know that there would be any question here. So I don't know what difference it makes that he made the decision prior to that. Because even if he had made the request as we think perhaps someone in his position would have done, it seems like he would have gotten the incorrect pension calculation worksheet because that's what, in fact, he got later. Let me tell you my problem with your argument. It's not so much with the issue of fact. It's with the materiality and the reliance part. Because it seems to me that the employer here never made the kind of representation that I think you think that they made. And it seems to me that the Shooks relied on a lot of factors other than the NCS date, especially when that he would have been able to continue in employment. There would not have been a reduction in force that would have affected him. And perhaps he did not make the kind of inquiry that the cases say that you ought to if you're going to act prudently. So that's my problem with your position. Well, it is on the record, of course, that he was aware that there would be a reduction in the workforce or that that was perhaps looming. What mitigated against him making the decision to retire was based on the information he was receiving, he had 23 years of service at the time. Two more years of service would entitle him to his full pension benefits. So they were working under the assumption that the layoffs were in the future, not imminent. Two more years of service would have provided him with that full pension benefit. And so they took that into account in making their decision, spoke with the local union president, who was in agreement that the layoffs were looming, but that two years would probably not be unreasonable for him to continue. But to your point, I think what we're speaking of is, was it reasonable for him to rely on this, or should he have made further inquiry? Or is the record sufficient as to exactly what he did rely on? I mean, what do you think is in the record as to, I did this specifically because I was told this date? Well, I think Appali is going to argue that those letters have this disclaimer language, that it's used for vacation and disability benefits, and that points to the fact that he shouldn't have used this date to calculate his pension benefits anyway. But it's interesting, if you look earlier in the correspondence, there's a March 10, 1999 letter, which specifically says your RPS date is to be used for calculation of vacation and benefit services. But even separate and apart from that, even if we assume NCS date equates to pension and he can multiply by 60 as well as anyone else can. But what is there in the record that he says, you know, this was the precise reason and the only reason that we made the decision that she should retire in 2003? I think that's Judge Sirica's point, is that there were a lot of things going on here, and while he was told this, if he'd been told something else, do we know from the record that but for this, this decision wouldn't have been made? Is that in the record? I think it's clear from his deposition that when asked what he relied on, he relied on the November 21, 2000 letter, which calculated his NCS date as October 30, 1980. And that was the reason taking account into what all the decisions that everyone would make in retiring, but it was that understanding of what he could use to calculate his pension benefits that did in fact force them to make the decision to retire the way they did. Three years later. Correct. But he also, as I recall, he also said that he relied on the fact that he would not be laid off before that 25-year period. He did. He spoke with the local union president who represented to him that she believed it would not happen. She obviously couldn't guarantee that. But she's not, the union is not the institution that makes that kind of decision. No, but I think the union president would have knowledge from the company given the bargaining situation and would have a good sense of what would be happening to bargain unit members. So, again, whether in fact he should have done more may go to how reasonable his reliance on that letter was, but it's clear that's what he relied on. Mr. Donahue, I'd like to talk a little bit about the detrimental reliance factor, because even if we assume that there was, even if we find that there's a question of fact on the materiality question, are you arguing that there was reliance both by Richard and Karen or just by Karen? Well, they made a joint decision for, given his position that two more years would provide him with his full pension benefits, they made a joint decision that it was in their best financial interest for Karen to make the retirement because his pension benefits would be fully vested in two years. Okay, but it was the retirement decision of Karen's that you're saying is the detrimental reliance, is it not? That's what is to their detriment, obviously, was her retirement. Without the full pension that they were anticipating. Correct. If he had known that he was only going to have 14 years versus 24 years at the time they made the decision, they would not have made that decision for her to retire. Now, there are cases in which we have said that it's more than just a retirement decision that can be actionable. Yes. But have we ever said that it's a decision by someone other than the participant in the plan that can be actionable? There are cases in which beneficiaries, a fiduciary under ERISA owes the same duty to a beneficiary that they do to a participant. Now, there is some question here because the way the plan is written, there is no definition of a beneficiary, and ERISA says you're either, a participant is either somebody that is designated, or a beneficiary is somebody designated by the participant or by the terms of the plan. But does the fact that fiduciary duty is owed to a beneficiary and arguably to Ms. Shook, is that controlling as to whether the conduct by someone other than the participant is permitted to be the conduct that's an act in reliance? Is there a case you can cite where we've made that step? I mean, I think as Your Honor knows, there's nothing directly on point with this exact factual scenario. The case that's, I think, closest that was cited in our initial brief was the Adams versus Freedom Forge case where the participant's retired spouses had been promised health care for life, and the company pulled back the health care for life. And the court dealt with participants and those retired spouses who were beneficiaries in the same manner and didn't make a distinguishing, didn't make any distinction between those who are actual employees and participants and those who had been beneficiaries or retired spouses. But that's, again, a fiduciary duty case. Correct. Mr. Downey, in UNICEF's three, we said an employer, even when acting in a fiduciary capacity, is not responsible for harm that is not reasonably foreseeable. Now, how can you say that the fiduciary, in acting here, would have reasonably foreseen that Karen would have made some retirement decision based on the actions of the fiduciary? Well, I think I tried to point out in our supplemental brief that as a beneficiary, she is or will become entitled to the same benefits. So if we look at that letter, if that letter had been sent to Karen because Richard had pre-deceased her, nothing in our analysis would change. We would go back to whether it was, in fact, reasonable for her. I understand that. But how could you say that the fiduciary of this pension plan would have had the foresight to have been able to say, wait a minute, I not only have to be concerned about what Richard might do if we make a mistake here in our letter, but we also need to be concerned about what spouses may do, who may be employed by somebody else if they get the wrong information in our letter. How can that be reasonably foreseeable? I think they try to point out, obviously, that what we're doing is opening a Pandora's box here. How far do we go? But we're not asking the court to go beyond what ERISA mandates, which is participants and beneficiaries are owed the same duty. She is a beneficiary of his policy by law, right? Even the policy itself in Section, I think, 7.2 speaks. So would you say then it would be proper for us to say that if a participant or a beneficiary, assuming Karen is a beneficiary here, which I think she is, if either of them would make any decision, any employment-related decision based on the representation, we could be responsible for it? Are you asking us to go that far? I don't know if I'm asking you to go all that. I'm saying under the factual scenario here. Under facts like these. Under facts like these, I think it's proper to – obviously, if it's foreseeable that the letter would cause a participant to be confused about what his benefits would be, why is it any different that it would be foreseeable that it would cause the beneficiary? The letter itself is what's causing the foreseeability. And so I don't think it makes a difference to the foreseeability who it's going to, whether it's going to the spouse or the participant. It's really the letter itself that is the foreseeability part. If you misrepresent a service credit date, that's bound to be foreseeable to mislead. But isn't the distinguishing factor here that I think helps you and maybe cabins as far as we go is that you're contending it was his decision as much as hers? It was. It was a joint decision. When she retired. Obviously, if she made a decision that was unrelated to anything that had to do with him, and I think to Judge Fischer's point, that's exactly it. If she made a decision independent of something that was represented or speaking to her husband who was the participant, then I don't think the court needs to go there. Here, they spoke together because of a representation that was made to them. I think it's easy to say, clearly, if a beneficiary makes a decision to retire unrelated to anything that the company does or unrelated to actions with a participant, then the court doesn't have to go in that direction. I'm going to say I'm out of time, but thank you. Thank you, Ben. Mr. Newman? May it please the Court, Michael Newman from the Dinsmore & Scholl firm in Cincinnati on behalf of the defendant, Belia Valle, Inc. Your Honor, to get to the question of detrimental reliance, I think it was certainly not foreseeable whatsoever that Mrs. Schuch's November 2003 retirement would have been known to the plan or could have been foreseen by the plan. Did you argue that before the district court? I thought you argued that she lacked standing. I don't know that you made a specific argument that what they did in terms of her retirement was something that would be within the realm. That's correct, Your Honor. That issue really came up in the supplemental briefing requested by Your Honors. Maybe we opened Pandora's box. Not that we necessarily have to keep it open. Understood, Your Honor. It seems the panel is very familiar with the facts of this case. I'll be happy to go over what I believe the relevant arguments are or answer any questions the court may have. Let's start with the first, which was, was there a misrepresentation here of the credit service date? I think there was. Is there an issue with that? And then let's move on to the other materiality. There were three letters, Your Honor. The third letter at issue came 13 months after Mrs. Schuch retired. It was in December of 2004. By that time, Mrs. Schuch had already retired. Let's talk about the letters that led up to, because that's what had to be a misrepresentation. I think those letters are very clear. Two points about those letters. They refer to disability benefits, disability eligibility and sickness. They don't talk about the amount of benefits at all. No, but they say NCS. And NCS, you know, the lights go blinking. You know that that is your net credit service. Admittedly, there was some inconsistency there. However, the letters also said, if you have any questions, call the Avaya plan administrator. And Mr. Schuch testified in his deposition he never made any efforts whatsoever to contact the plan. So there might be an issue of fact here on the misrepresentation. Well, I think I would respectfully suggest not, Your Honor. I think Judge Chacon was correct in finding not, because the function of those letters were really to advise Mr. Schuch of his eligibility for vacation and sickness under the plan. As the Court is well aware, there was a memorandum of understanding entered into between Mr. Schuch's union, the Communication Workers of America, and Lucent, who was the predecessor entity to Avaya. But if you look at 373. Yes, Your Honor. And after you file a grievance, you get a letter. And it says, reason for adjustment, rehire. Rehire date. Current NCS date, 12-19-88. Adjusted NCS date, 10-30-1988. And it's telling you, your adjusted NCS date, which means take it, multiply the months by 60, and you'll come up with what you're going to get, has been changed. If I got this letter, after all that went before, I would say, wow, you know, eureka. It's been adjusted. But if you go down two sentences, it talks about, quote, your eligibility for disability benefits and vacation. But that's not what NCS. Well, the supervisor will need this document to determine your eligibility. Well, they might need a lot of documents to determine your eligibility. But NCS, tell me how NCS doesn't signal exactly what your pension is based on. I think it does, Your Honor. Okay. How does it not say you multiply by 60 the number of months going back to October 3080? How does it not tell someone that? What I would respond to is if you turn to the very next page in the Joint Appendix, which is 3-8-74. That's the first document where Mr. Shook actually asked the plan, what precise benefits will I get per month? And he did not do that until a year after Mrs. Shook retired. Why did he need to do that? I mean, if I got this and I've been calculating my – and he was right on in his calculation. He had it almost, you know, to the penny of what he was going to get based upon October 80. Where in the plan does it say, you know, unless you have received a, you know, something formal, any representations as to NCS are – you're not entitled to rely on? I admit, Your Honor, there's an inconsistency here and there's no getting around it. I would, however, remind the Court of the Memorandum of Understanding, which was the document that his union entered into with Lucent, which said that your total years of service count towards your eligibility for a pension, but they don't count towards the actual amount of your pension. But NCS doesn't say that. NCS says – I mean, the whole point was his NCS was wrong. It wasn't the 1980. Yes, but Mrs. Shook in her deposition testified that she did not do anything in reliance on these documents, that Mr. Shook made those decisions. And Mr. Shook testified in his deposition – the cite to her is Joint Appendix 453. Can you identify the factors that you and Mr. Shook took into consideration when you made the decision that you should retire? Her partial answer is, well, he – and he took – he was better at doing all that investigation than I was. So he really took care of all of that. And Mr. Shook testified on – in 442, Joint Appendix 442, did you ever request from Avaya or anybody associated with Avaya an estimate of your pension benefits prior to the time that Mrs. Shook retired? And go down a couple lines. He says, just talking to people. And then I said, just so I'm clear, talking to your coworkers? And he said, yes, correct. So he never contacted the plan. He never did anything that these letters were talking about suggested he do. He just talked to his coworkers, and he got wrong advice. Well, but presumably, after he got that letter saying October 30, 1980, why wasn't he entitled to rely on that as a representation? And he could do the calculation himself. I think any reasonable person, knowing that this memorandum of understanding says that your prior years of octel service don't count towards the actual amount of your benefits, and then getting a letter that appears to suggest something different, a reasonable person would contact the plan and say, how do these two documents, how do they jive? I don't understand. He did none of that. He admits he did none of that. Your Honors, I'd be happy to answer any other questions the Court has. I think this case, quite frankly, is one where there were three notices, there were three letters in question. Two of them really, as we've talked about this morning, go to disability and sickness. It's the third letter at issue. That one, issued in December of 2004, was 13 months after Mrs. Shook retired. There was a mistake, we admit, but it was cured within 13 days, and Mr. Shook testified that within that 13-day period, he did nothing. His exact word was nothing. So after she retired, the next notice he got reinforced the fact that it was 1980. But then two weeks later, he said, no, we're wrong, it wasn't 1980. That's correct, Your Honor. It's Joint Appendix 374 and 375. And the mistake was caught essentially immediately, 13 days later. But it was a longstanding mistake from November of 2000 through and including December 14th of 2004. Well, that's one way to look at the documents, Your Honor. But I would respectfully suggest to the Court that the earlier documents really go towards disability and sickness. And again, the earlier documents actually have phone numbers for him to call and say if you have any confusion. I mean, I'm looking at Document 372, for example. It said, should you have any questions, please do not hesitate to call Linda S. Phillips at, and then it gives a telephone number. A reasonable person, I'd respectfully suggest to the panel, would have called Ms. Phillips and said, I don't understand. Here's this memorandum of understanding. My union says I don't get all these benefits, but now you're telling me maybe I do? What's right here and what's wrong here? He did nothing. What was the grievance date? I'm sorry, was that after April of 2000? You know, I don't recall, Your Honor. Forgive me. I'm sorry. Yes, Judge Fischer. I want to go to this detrimental reliance question again. Now, do you agree that, for this question, that Karen Shook was a beneficiary? I think that's, as a matter of law, that's very debatable. My view is that she's not. So you don't agree? Correct. Why is that? She was not a participant in the plan. Her husband was.  But wasn't there an option that could be taken that would take less so that, at his death, she would have a 50 percent survivorship annuity out of this pension? That is correct. Why wouldn't that make her, so long as she met the one qualifying factor that they were married and there's no allegation that they aren't, why wouldn't that make her a beneficiary? I would argue that she would be a beneficiary had these benefits actually come to fruition. At the time we took Mr. Shook's deposition, I haven't spoken to him since that time, he hadn't actually collected his pension. And my understanding is I think even to this date, today, he hasn't actually gotten this pension. So there's been no disbursement about these funds. We're talking about, I mean, I believe actually this may even be a standing issue because the pension hasn't actually been distributed to him yet. Does that matter? Doesn't it still owe fiduciary duties to her as qua beneficiary, even though it hasn't happened yet? I mean, what else? Once a beneficiary, once it is distributed, you're no longer a beneficiary, you're a recipient. So certainly you have to be at least a beneficiary while you're waiting. I would agree with that, Your Honor. I asked the questions to Mr. Downey as to how far we should go if we open Pandora's box here. And he said, he sort of said that under facts like this, we should go at least as far as the participant and a beneficiary spouse. Do you agree with that? No, I don't. Why not? With all due respect to Mr. Downey, I think that his opening Pandora's box, the Third Circuit has not gone there. To my knowledge, no other circuit has gone there. I researched this issue fairly carefully for the supplemental brief.  Well, Mouser looked like it would go there, but they just said that there wasn't any causation in that case. That's correct. And I think that's my view. Isn't that different than not going there? I think that's dicta by the First Circuit, quite frankly, Your Honor. Okay. No court, and I researched this issue pretty carefully because in response to the court's order for the supplemental brief, I want to make sure, I did not find anything. And that's really only a passing reference. That's a Lexis, very detailed Lexis search that happened to turn that up. I would just believe that's dicta, Your Honor. Okay. And I think it would be opening Pandora's box. It would not be reasonable and foreseeable for a planned administrator to know, potentially, here we're talking about a wife, but once you open that box, how many other individuals could foreseeably be out there, and it would be incredibly difficult to administer as a practical and a legal matter. Except here, the distinguishing feature that I mentioned to Mr. Downey, that it was a joint decision about their pooled resources for their retirement. Except I would remind you, Your Honor, about Mrs. Shook's deposition where she's admitting that this was totally hands-off. She let Mr. Shook handle this matter. And he admitted that he — I bet you'd hear a lot of that with retirees these days. Sure, of course, of course. And maybe some where their husband says, you know, she takes care of it all. Sure. And I will tell the court, I met Mr. and Mrs. Shook when I deposed them, and they're lovely people, and this has nothing to do with them. Individually, we're just talking about the legal matters here. I certainly understand, Your Honor. Anything else you want to tell us? No, Your Honors, but I do appreciate the court's time this morning. Thank you very much. Thank you very much. Just one quick point, I think. In order to fully understand — Mr. Newman here talked about three letters being an issue, and I think to fully understand what went on here and what my clients were dealing with, it's important to look at the whole scope of correspondence and to put it in order, starting with the memorandum of understanding between CWA and Lucent and going forward, because the dates continue to change. What was said at one point was your NCS date will not include octal service. He grieves. It includes it. So RPS is going to be what determines your vacation and disability benefits, and then a later letter, which includes the NCS date they're trying to say represent. Those dates are different. How can both represent vacation and disability benefits? They can't. But I think his point is, given that confusion, is there an obligation not to just go with the latest but to pick up the phone and call and say, what's going on here? What are you telling me? I think if the standard were what the district courts sometimes seem to confuse it with, is this had to be a willful misrepresentation, absolutely. But that's not the standard. The standard is that even a negligent misrepresentation can be relied upon. And this clearly, as they admitted, there were mistakes made here. There were confusions here. I think any reasonable person looking at these documents might come to the conclusion that he did, which is the NCS date represented what his pension would be. So thank you, Your Honor. Good. Mr. Downey, Mr. Newman, thank you very much. The case was very well argued. We'll take the matter under advisement. Thank you, Your Honor. Thank you.